PT:NS/SK/BDM
F.#2017R00745

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

RICHARD LAI,

        Defendant.


- - - - - - - - - - - - - - - - - - -X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 27 2017 ★

**BROOKLYN OFFICE**

I N F O R M A T I O N

Cr. No. 17-224 (PKC)
(T. 18, U.S.C.,
§§ 981(a)(1)(C), 1349 and
3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c); T. 31,
U.S.C., §§ 5314 and
5322(b))

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

      At all times relevant to this Information, unless otherwise indicated:

I.   <u>Background</u>

    A.   <u>FIFA</u>

        1.   The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA, an entity registered under Swiss law and headquartered in Zurich, Switzerland, was composed of as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories. The United States first

became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following in the 1990s. At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

2. Each of FIFA's member associations also was a member of one of six continental confederations recognized by FIFA: the Confederation of North, Central American, and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC"). Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations. Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3. FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body. FIFA also had a president, who represented

2

the association worldwide and was responsible for the implementation of decisions. FIFA also operated several standing committees whose members included soccer officials from various national member associations.

4.     Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

5.     FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations. FIFA helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program and the Goal Program.

6.     FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006, again in 2009, and most recently in 2012 (generally, the "FIFA code of ethics"). The FIFA code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues and clubs. Among

3

other things, the FIFA code of ethics provided that soccer
officials were prohibited from accepting bribes or cash gifts
and from otherwise abusing their positions for personal gain.
The code of ethics further provided, from its inception, that
soccer officials owed certain duties to FIFA and its
confederations and member associations, including a duty of
absolute loyalty.  By 2009, the code of ethics explicitly
recognized that FIFA officials stand in a fiduciary relationship
to FIFA and its constituent confederations, member associations,
leagues, and clubs.

7.    Among other tournaments, FIFA organized the World
Cup, the sport's premier event, a quadrennial international
tournament involving the senior national men's teams of 32
nations.

B.    The AFC

8.    The AFC was a continental soccer confederation
registered as a legal entity under the laws of Malaysia and
headquartered in Kuala Lumpur, Malaysia.  Like FIFA, the AFC was
governed by its own Congress, general secretariat, executive
committee and standing committees.

9.    Since at least March 2011, the AFC imposed a
written code of ethics (the "AFC code of ethics"), which
governed the conduct of AFC soccer "officials," a term defined
similarly as in the FIFA code of ethics, to include members of

4

AFC executive and standing committees, AFC employees, and officials of AFC national member associations.  Among other things, since at least March 2011 the AFC code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain.  The AFC code of ethics further provided that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of loyalty.  By at least 2013, the code of ethics explicitly recognized that AFC officials stand in a fiduciary relationship to FIFA, AFC, and their constituent confederations, member associations, leagues, and clubs.

10.     The AFC comprised as many as 47 member associations, representing organized soccer in the Middle East and the Asia/Pacific region.  The AFC's member associations included federations representing two territories of the United States: the Guam Football Association ("GFA") representing the island of Guam, which was also a member association of FIFA, as well as the Northern Mariana Islands Football Federation, which was an associate member of the AFC.  Among other tournaments, the AFC organized the Asian Cup, featuring the top men's national teams in the region, as well as the AFC Champions League, a tournament featuring the top men's club teams.

11.   The AFC also organized World Cup qualifier matches played by national teams seeking to qualify for the World Cup, using a variety of formats.

II.   The Defendant

12.   The defendant RICHARD LAI was a citizen of the United States and a resident of Guam.  Since 2001, LAI served as the president of the GFA, and at various times relevant to this Information LAI was a member of the AFC executive committee, chairman or a member of the AFC finance committee, a member of the AFC marketing committee, and a member of the FIFA audit and compliance committee.

13.   As an official of GFA, AFC, and FIFA, the defendant RICHARD LAI was bound by fiduciary duties to those organizations.

III.  The Defendant's Co-Conspirators

14.   The defendant RICHARD LAI conspired with, among others, a number of soccer officials, and with officials and employees of other sports governing bodies, including the following, whose identities are known to the United States Attorney:

15.   At various times relevant to the Information, Co-Conspirator #1 was a high-ranking official of FIFA and the AFC.

16.   At various times relevant to the Information, Co-Conspirator #2 was a high-ranking official of FIFA, the Kuwait

6

Football Association ("KFA"), and the Olympic Council of Asia ("OCA"), which was one of five continental associations recognized by the International Olympic Committee, and which governed sports in Asia.

17.  At various times relevant to the Information, Co-Conspirator #3 was a high-ranking official of the OCA and an official of the KFA.

18.  At various times relevant to the Information, Co-Conspirator #4 was an employee of the OCA and an assistant to Co-Conspirator #3.

IV.  The Defendant's Participation in Bribery Schemes

A.  2011 FIFA Presidential Election Scheme

19.  In or about January 2011, the defendant RICHARD LAI became aware of rumors that Co-Conspirator #1 intended to become a candidate for president of FIFA.  At the time, Co-Conspirator #1 was a high-ranking official of FIFA and the AFC.  In accordance with FIFA statutes, the president of FIFA was elected by the FIFA congress, which was composed of representatives from each of the more than 200 FIFA member associations, including the GFA.

20.  Also in or about January 2011, while they were attending the Asian Cup finals, Co-Conspirator #1 approached the defendant RICHARD LAI and offered to pay him $100,000 as a consultant to assist with the purchase of construction materials

7

in China for Co-Conspirator #1's construction business. LAI indicated that he would consider Co-Conspirator #1's proposal and asked Co-Conspirator #1 to send him a consulting agreement.

21. In or about March 2011, the defendant RICHARD LAI again asked Co-Conspirator #1 for the consulting agreement, and Co-Conspirator #1 said it was still being prepared. Also in or about March 2011, Co-Conspirator #1 declared his candidacy for the FIFA presidency in the election then scheduled for June 1, 2011.

22. On or about April 4, 2011, $50,000 was wired from an account in Qatar controlled by Co-Conspirator #1 to an account held in the name of the defendant RICHARD LAI at HSBC Philippines (the "Lai Philippines Account"). The funds were transmitted to the Lai Philippines account through correspondent accounts at Citibank, N.A. and HSBC Bank USA, N.A. in the United States. LAI called Co-Conspirator #1 and asked him what the money was for, and Co-Conspirator #1 replied that it was for consulting fees and not to worry, as the consulting contract would be sent to LAI soon. LAI also communicated with Co-Conspirator #1 about this payment and consulting agreement using a personal email address (the "LAI email address"), on at least some occasions from Guam. All emails sent to or from the LAI email address passed through a server located in the Eastern District of Virginia. LAI never received a consulting agreement

from Co-Conspirator #1 and never provided any consulting services to Co-Conspirator #1 or his businesses.

23. The purpose of the $50,000 payment he received from Co-Conspirator #1 was to induce the defendant RICHARD LAI to vote for and otherwise support Co-Conspirator #1 in the upcoming FIFA presidential election. On or about May 5, 2011, another $50,000 was wired from a different account in Qatar controlled by Co-Conspirator #1, again through correspondent accounts at Citibank, N.A. and HSBC Bank USA, N.A. in the United States, to the Lai Philippines Account. The purpose of this payment was similarly to induce LAI to vote for and otherwise support Co-Conspirator #1 in the upcoming FIFA presidential election.

24. In or about June 2011, Co-Conspirator #1 was suspended from his positions at FIFA and the AFC for bribing and attempting to bribe voters in the upcoming presidential election. However, the defendant RICHARD LAI did not attempt to return or otherwise give up any of the $100,000 he had received from Co-Conspirator #1. Neither did LAI disclose to anyone that he had received these funds, notwithstanding the fact that Co-Conspirator #1's bribery of FIFA presidential election voters was widely publicized, resulted in Co-Conspirator #1's suspension from FIFA, and prompted multiple FIFA investigations.

B.    Scheme to Gain Control of the AFC and Influence FIFA

25.    In or about May 2009, representatives of the AFC national member associations met in Kuala Lumpur, Malaysia for the 23rd AFC Congress (hereinafter, the "2009 AFC Congress"). Among other matters, the 2009 AFC Congress met to approve the 2009-2012 AFC budget and to conduct an election for one of four seats reserved for the AFC on the FIFA Executive Committee.  At the time of the 2009 AFC Congress, Co-Conspirator #1 - who was then President of the AFC - also held the AFC seat on the FIFA Executive Committee that was being contested at the 2009 AFC Congress.  The then-president of the Bahrain Football Association ("BFA"), an individual whose identity is known to the United States Attorney (hereinafter "Candidate #1"), ran against Co-Conspirator #1 as a competing candidate in the election for the FIFA Executive Committee seat. Co-Conspirator #2 supported Candidate #1's candidacy.  Co-Conspirator #1 ultimately won the election held at the 2009 AFC Congress by a vote of 23 to 21 and retained his seat on the FIFA Executive Committee.

26.    Also during the 2009 AFC Congress, the defendant RICHARD LAI gave a speech in which he expressed misgivings regarding Co-Conspirator #1's leadership of the AFC and urged AFC members not to approve the proposed 2009-2012 AFC budget. The proposed 2009-2012 AFC budget was created and supported by

Co-Conspirator #1, who was then President of the AFC.
Notwithstanding LAI's opposition, the 2009 AFC Congress voted to
approve the 2009-2012 AFC budget.

27.   Following the defendant RICHARD LAI's speech at
the 2009 AFC Congress, Co-Conspirator #3 approached LAI and
asked him to meet with Co-Conspirator #2, which LAI did.   During
their meeting, Co-Conspirator #2 indicated his appreciation for
the sentiments LAI had expressed during his speech at the 2009
AFC Congress, particularly LAI's displeasure with
Co-Conspirator #1's leadership of the AFC.   Co-Conspirator #2
asked LAI if anyone had paid LAI to give that speech and oppose
Co-Conspirator #1, and LAI said that no one had paid him.

28.   Later in 2009, Co-Conspirator #3 and the
defendant RICHARD LAI discussed how Co-Conspirator #1 was
depriving the GFA of soccer development funds to which the GFA
was entitled.   Co-Conspirator #3 told LAI not to worry and
offered financial support if LAI needed it.   LAI said he needed
money to hire a coach for Guam's national soccer team, and Co-
Conspirator #3 said that he and Co-Conspirator #2 could provide
the GFA with $200,000 for the coach.   But when Co-Conspirator #3
asked for bank account information in order to send the funds,
he did not ask for the account information for the GFA's bank
account, but rather asked for account information for a bank
account held by LAI personally.   In response, LAI gave Co-

11

Conspirator #3 the information for an account LAI held at HSBC
Bank Hong Kong (the "Lai HSBC Hong Kong Account"). On or about
November 3, 2009, Co-Conspirator #3 wired $200,000 from an
account in his name in Kuwait to the Lai HSBC Hong Kong Account
through correspondent accounts at HSBC Bank, N.A. and Citibank
N.A. in the United States.

29. The defendant RICHARD LAI never transferred these
funds to GFA accounts. Instead, on or about November 17, 2009,
LAI wired $200,000 from the Lai HSBC Hong Kong Account to an
account in his name at First Hawaiian Bank in Guam. LAI never
used these funds to hire a coach for the Guam national soccer
team, or to otherwise benefit the GFA.

30. After the defendant RICHARD LAI received this
$200,000 payment in November 2009, Co-Conspirator #2 and Co-
Conspirator #3 began using LAI's assistance in furtherance of
their efforts to diminish Co-Conspirator #1's power and
influence over the AFC and FIFA. Ultimately, their goal was to
gain control of the AFC by ensuring that their allies obtained
positions of leadership within the AFC, rather than Co-
Conspirator #1 or his allies, and to influence FIFA, including
through the election of AFC representatives to the FIFA
Executive Committee. These efforts were ultimately successful,
as Candidate #1 eventually was elected president of the AFC and
a member of the FIFA Executive Committee, Co-Conspirator #2 was

12

ultimately elected to the FIFA Executive Committee, and Co-
Conspirator #1 was banned for life from holding positions in
organized soccer.

31.  After the initial payment of $200,000 in November
2009, the defendant RICHARD LAI periodically received, in
offshore accounts he controlled, wire transfers from accounts in
Kuwait controlled by Co-Conspirator #3 or his assistants at the
OCA.  On some occasions, LAI asked Co-Conspirator #3 for
additional funds, and on other occasions Co-Conspirator #3 sent
or caused the funds to be sent without being asked.  These
payments continued until in or about the fall of 2014.

32.  Such additional transfers included the following,
all of which the defendant RICHARD LAI received in the Lai HSBC
Hong Kong account: (a) $20,000 on October 7, 2010, through
correspondent accounts at Citibank, N.A. and HSBC U.S., N.A. in
the United States; (b) $100,000 on February 16, 2011, through
correspondent accounts at HSBC U.S., N.A. in the United States;
(c) $200,000 on August 11, 2011, through correspondent accounts
at HSBC U.S., N.A. and J.P. Morgan Chase, N.A. in the United
States (d) $125,000 on January 17, 2012, through correspondent
accounts at Citibank, N.A. and HSBC U.S., N.A. in the United
States; and (e) $125,000 on February 14, 2012, through
correspondent accounts at J.P. Morgan Chase, N.A. and HSBC U.S.,

13

N.A. in the United States.  Over time and in total, LAI received
at least $770,000 in this manner.

33.   Like the funds he received from Co-Conspirator #3
in November 2009, the defendant RICHARD LAI kept these funds for
himself, and never used them to hire a coach for the Guam
national soccer team or to otherwise benefit the GFA.  On some
occasions Co-Conspirator #3 told LAI to write an email asking
for the money, so Co-Conspirator #3 could show it to Co-
Conspirator #2.

34.   On one occasion when the defendant RICHARD LAI
met Co-Conspirator #3 outside of the United States, he attempted
to give him a significant amount of cash in a bag, but LAI
declined the offer of cash because he did want to travel back to
United States territory with more than $10,000 in cash.

35.   One of the functions the defendant RICHARD LAI
performed for Co-Conspirator #2 and Co-Conspirator #3 in
exchange for the funds they sent him was to advise them on who
was supporting which candidates in AFC and FIFA matters,
including elections, and who Co-Conspirator #2 and Co-
Conspirator #3 should recruit to support their chosen
candidates.  LAI similarly advised Co-Conspirator #2 and Co-
Conspirator #3 as to which soccer officials or former soccer
officials from various national member associations within the
AFC they should attempt to persuade to join them in opposing Co-

14

Conspirator #1.  In furtherance of these goals, LAI arranged for meetings between such soccer officials and Co-Conspirator #3 or Co-Conspirator #4.  LAI did not personally participate in these meetings or ask the participants what was discussed during the meetings, because LAI understood that at these meetings Co-Conspirator #3 or his assistants would offer or make bribe payments to these soccer officials, and LAI did not want to be present for or gain direct knowledge of such payments.

36.  Another component of the defendant RICHARD LAI's efforts to advance the interests of the faction led by Co-Conspirator #2 and Co-Conspirator #3 was by ensuring that an accounting firm performed a thorough audit of the AFC's financial records after Co-Conspirator #1 was suspended from holding positions in soccer in 2011.  This audit uncovered, among other things, the misuse of funds by Co-Conspirator #1 when he was president of the AFC.  After this audit was provided to FIFA, Co-Conspirator #1 was banned for life from holding positions in soccer.  Later, a high-ranking FIFA official, the identity of whom is known to the United States Attorney ("Official #1"), met with LAI and thanked him for his work on the audit.  Official #1 subsequently rewarded LAI for these efforts by having LAI named to the FIFA audit and compliance committee in or about July 2013.

15

37.    The defendant RICHARD LAI often communicated with
Co-Conspirator #3 and Co-Conspirator #4 about these matters, as
well as the payments he received, via electronic mail using the
LAI email address.

38.    Neither the defendant RICHARD LAI nor any of his
co-conspirators disclosed the foregoing bribery and kickback
schemes to FIFA, the AFC or the GFA, including without
limitation to those organizations' respective executive
committees, congresses, or constituent organizations.

## COUNT ONE
(Wire Fraud Conspiracy –
2011 FIFA Presidential Election Scheme)

39.    The allegations contained in paragraphs one
through 38 are realleged and incorporated as if fully set forth
in this paragraph.

40.    In or about and between January 2011 and May
2011, both dates being approximate and inclusive, within the
District of Guam and the Eastern District of Virginia, the
defendant RICHARD LAI, together with others, did knowingly and
intentionally conspire to devise a scheme and artifice to
defraud FIFA, the AFC, the GFA and their constituent
organizations, including to deprive FIFA, the AFC, the GFA and
their constituent organizations of their respective rights to
honest and faithful services through bribes and kickbacks, and
to obtain money and property by means of materially false and

16

fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Wire Fraud Conspiracy –
Scheme to Gain Control of the AFC and Influence FIFA)

41. The allegations contained in paragraphs one through 38 are realleged and incorporated as if fully set forth in this paragraph.

42. In or about and between November 2009 and September 2014, both dates being approximate and inclusive, within the District of Guam and the Eastern District of Virginia, the defendant RICHARD LAI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, the AFC, the GFA and their constituent organizations, including to deprive FIFA, the AFC, the GFA and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the

17

purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers and email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT THREE
#### (Willful Failure to File Reports of Foreign Bank and Financial Accounts)

43. The allegations contained in paragraphs one through 38 are realleged and incorporated as if fully set forth in this paragraph.

44. At all times relevant to Count Three:

(a) Pursuant to Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c), 103.27(d) and 103.59(b), citizens and residents of the United States who had a financial interest in, or signature authority over, a bank, securities and other financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the United States

Department of the Treasury a Report of Foreign Bank and Financial Accounts on Form TD-F 90-22.1 (the "FBAR").

(b) The FBAR for a given year was due by June 30 of the following year.

(c) On or before June 30 of each year from 2012 through 2015, within the Eastern District of New York and elsewhere, the defendant RICHARD LAI did knowingly and willfully fail to file with the United States Department of the Treasury a Report of Foreign Financial and Bank Accounts on Form TD-F 90-22.1, disclosing that he had a financial interest in, and signature and other authority over, one or more bank, securities and other financial accounts in one or more foreign countries, to wit: (a) the Lai HSBC Hong Kong Account, which had an aggregate value of more than $10,000 during at least each of the years from 2011 through 2012; (b) the Lai Philippines Account, which had an aggregate value of more than $10,000 during at least the year 2011; and (c) a bank account at Hang Seng Bank in Hong Kong, which had an aggregate value of more than $10,000 during at least each of the years 2013 and 2014, while violating

another law of the United States, to wit: Title 18, United States Code, Section 1349.

(Title 31, United States Code, Sections 5314 and 5322(b); Title 18, United States Code, Sections 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE AND TWO

45. The United States hereby gives notice to the defendant that, upon his conviction of either of the offenses charged in Counts One and Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

46. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value;

or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

21